# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# (SOUTHERN DIVISION)

J. LINCOLN CROCKER, Individually and on behalf of all others similarly situated

        Plaintiffs,

    v.

BBC EQUITIES, L.L.C.; BRAVATA FINANCIAL GROUP, L.L.C.; BBC CAPITAL, L.L.C.; BBC HOLDINGS 1-50, LLC; BBC HOLDINGS I-XI, LLC; FERNDALE LOFTS, LLC; PHOENIX VENTURES CAPITAL, LLC; JOHN J. BRAVATA; JAMES JOE BRAVATA; RICHARD J. TRABULSY; ANTONIO M. BRAVATA; SHARI A. BRAVATA; JOHN SELLERS; AARON SIMON; and EQUITY TRUST COMPANY.

        Defendants.

Case No. 09-13158
Hon. David M. Lawson

_____/

Mark L. Newman (P51393)
Christopher D. Kaye (P61918)
950 W. University Drive, Suite 300
Rochester, MI  48307
(248) 841-2200
Attorney for Plaintiff

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

        NOW COMES Plaintiff J. Lincoln Crocker, by and through his attorneys The Miller Law Firm, and for his Complaint alleges as follows:

## OVERVIEW

1.     The subject of this Complaint is an offering fraud and Ponzi scheme involving approximately $50 million and at least 440 investors. The fraud was perpetrated by Defendants John J. Bravata ("John Bravata"), Richard J. Trabulsy ("Trabulsy"), John Sellers, and James Joe Bravata ("Joe Bravata") (together, the "Executive Defendants"), several of their companies – Defendants BBC Equities, LLC ("BBC Equities") and Bravata Financial Group, LLC ("Bravata Financial"), BBC Holdings 1-50, LLC (together, the "50 BBC Holdings"), BBC Holdings I-XI, LLC (together, the "XI BBC Holdings"), BBC Capital, LLC ("BBC Capital"), Phoenix Venture Capital, LLC ("Phoenix"), and Ferndale Lofts, LLC ("Ferndale Lofts") (all of these corporate defendants together, the "Corporate Defendants") – assisted by Defendants Antonio M. Bravata ("Antonio Bravata"), Aaron Simon, Shari Bravata, and Equity Trust Company. (The Executive Defendants and the Corporate Defendants are collectively referred to herein as the "Senior Defendants." The Senior Defendants and the other defendants are collectively referred to as "Defendants.")  The fraud continued at least until the Securities and Exchange Commission (the "SEC" or the "Commission") filed a lawsuit on or about July 28, 2009.

2.     The Defendants characterized BBC Equities to prospective investors as a real estate investment fund, and as a safe investment vehicle with annual returns of 8% to 12%. However, BBC Equities was far from a safe investment. Unbeknownst to the investors, their proceeds were used to finance Defendants' expensive lifestyles, paying for luxury homes, watercraft, jewelry, gambling, exotic vacations, and expensive cars. Indeed, John Bravata used money from the first two investors to buy himself a $90,268 Ferrari. In total, John Bravata and Trabulsy spent at least $7 million of the investors' money for their own benefit, and for the benefit of John Bravata's wife, Shari A. Bravata, and for his son, Antonio Bravata.

3.      The Senior Defendants have lied to prospective investors about the use of investor funds; the risks associated with the investment; the purported compensation, commission, and finder's fees paid to Defendants and other; and the true financial condition of BBC Equities.

4.      To keep their scheme afloat, the Senior Defendants spent an additional $11.3 million of investor funds perpetrating a Ponzi scheme. They used new investment proceeds to make quarterly payments to earlier investors, among other payments. They have also spent $14 million of investment proceeds soliciting and raising money from new investors to fuel the scheme.

5.      Defendants' lavish spending and the cost of propping up their Ponzi scheme left BBC Equities with little to invest. Of the more than $50 million in investment proceeds, no more than $21 million remained for BBC Equities to use acquiring real estate properties. Worse, those properties are highly leveraged, with mortgages and other liabilities exceeding $128 million.

6.      Defendants' malfeasance has rendered BBC Equities financially insolvent. Its monthly expenses exceed its revenues by a ratio of more than 10-to-1. To avoid the collapse of their scheme, Defendants apparently continued to actively solicit new investors and fresh investment proceeds up until the time of the SEC lawsuit.  Now, many of the Defendants have seen their assets frozen, and the investors are unable to access the money they invested.

### THE PARTIES

7.      John J. Bravata, age 41, is a resident of Brighton, Michigan. He is a manager, co-founder, and the Chairman of BBC Equities and Bravata Financial. He is not, and never has been, registered with the Commission as a broker-dealer or as being associated with a broker-dealer firm that is registered with the Commission.

8.      Richard J. Trabulsy, age 26, is a resident of Northville, Michigan. He is a manager, co-founder, and the Vice-Chairman of BBC Equities and Bravata Financial. Trabulsy is not registered with the Commission as a broker-dealer or as being associated with a broker-dealer firm that is registered with the Commission.

9.      Joe Bravata, a resident of Brighton, Michigan, is John Bravata's brother. He is not, and never has been, registered with the Commission as a broker-dealer or as being associated with a broker-dealer firm that is registered with the Commission. He served as an employee and agent of BBC Equities and one or more additional Corporate Defendants, officially holding the title of Southfield/Brighton Branch Manager. In fact, his role in the scheme went beyond this title, and was intimately involved in the operation of the scheme described in this Complaint, exercising control over its operation.

10.     BBC Equities, LLC, is a Michigan limited liability company formed in May 2006 with its principal place of business in Southfield, Michigan. Defendants characterize BBC Equities as a real estate investment fund. John Bravata chose the name BBC Equities to stand for "Billionaire Boys Club" – an apparent reference to a 1980's-era ponzi scheme that began with high-living fraudsters and devolved into recriminations, murder, and an NBC miniseries. Defendants (in this latter-day Billionaire Boys Club) told investors that investment proceeds are used to buy various forms of real estate. From at least May 2006 through July 2009, Defendants raised at least $50 million from at least 440 investors by selling membership interests in BBC Equities. Certain BBC Equities offering materials, including private placement memoranda ("PPMs"), describe the membership interests as securities. BBC Equities has never been registered with the Commission as a broker-dealer. BBC Equities' securities are not registered with the Commission, nor were its offerings.

11.     Bravata Financial Group, LLC, is a Michigan limited liability company formed in January 2003, with its principal place of business in Southfield, Michigan, and with five other offices in Michigan, Ohio, and Kentucky. Bravata Financial is owned by John Bravata and Trabulsy. Bravata Financial purports to be a financial and estate planning firm that advises its clients regarding the purchase of securities, including BBC Equities securities, insurance, and annuities. Bravata Financial has never been registered with the Commission as a broker-dealer. Throughout the offering, John Bravata and Trabulsy owned and controlled BBC Equities and Bravata Financial. They control BBC Equities and Bravata Financial's bank accounts, books and records; they control the representations made and the flow of information to investors; and they control the use of investor proceeds.

12.     Antonio M. Bravata, age 21, is a resident of Brighton, Michigan and is John Bravata's son. He is not registered with the Commission as a broker-dealer or as being associated with a broker-dealer firm that is registered with the Commission. Despite not being registered or licensed, Antonio Bravata worked for BBC Equities and Bravata Financial as a sales agent. More than $444,384 of BBC Equities investor funds have been transferred to or spent for his benefit.

13.     Aaron Simon is a resident of Kalamazoo County, Michigan, and was an employee of one of the Corporate Defendants and served as a selling agent for BBC Equities and solicited investors on its behalf.

14.     John Sellers, a resident of Oakland County, Michigan, was an employee of Bravata Financial and one or more other Corporate Defendants.  He prepared materials used to solicit investors in the scheme and otherwise solicited such investors, and received a finder's fee for all investors in the program; for example, as of 2009, he received 8.33% of Bravata

Financial's net profits from securities operations.  He also oversaw and controlled the operations of the Corporate Defendants.

15.     Equity Trust Company is an Ohio corporation that bills itself as "the nation's leading provider of self-directed IRAs and 401ks, with over 45,000 clients in all 50 states and over 3 Billion dollars of retirement plan assets under management."

16.      Shari A. Bravata, age 43, is a resident of Brighton, Michigan and is John Bravata's wife. More than $1,872,000 of BBC Equities investor funds have been transferred to or spent for her benefit.

17.     Plaintiff J. Lincoln Crocker is a resident of Kalamazoo, Michigan.  As set forth below, he has lost an "investment" of approximately $250,000 in the Defendants' scheme.

**CLASS ACTION ALLEGATION**

18.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedures on behalf of all persons or entities who purchased any investment offered by Defendants from May 2006 until the present day (the "Class Period"), and who suffered damages as a result (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants that are not corporate entities; (iii) any person who was an executive officer and/or director of any Defendant during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

19.     The members of the Class, purchasers of Defendants' investments during the Class Period, are so numerous that joinder of all members is impracticable.  While the exact

number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least 440, if not higher.

20.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiffs and all members of the Class sustained damages as a result of the conduct complained of herein.

21.    Plaintiff will fairly and adequately protect the interest of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

22.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

23.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    Whether the investment vehicles sold by Defendants constituted "securities" under federal and state securities laws;

c.    With respect to Plaintiff's claims under Section 10(b) of the Exchange Act, whether the Section 10(b) Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the memoranda, press releases and public statements;

d.     With respect to Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the named Defendants are controlling persons of the Company;

e.     Whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

24.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

25.    The names and addresses of the owners of Defendants' securities purchased during the Class Period are obtainable from information in the possession of the Defendants and/or their agents.  Notice can be provided to such owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

27.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.   All Defendants are either residents of Michigan, or Michigan corporate entities organized under the laws of Michigan and headquartered in the state, except for Equity Trust Company, which is an Ohio corporation that does extensive business in the State of Michigan, including but not limited to its business arrangements with the Corporate Defendants.

28.    Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and

communication in interstate commerce, and the mails, in connection with the acts, transactions, practices, and courses of business alleged herein.

## FACTS

### A.    A Fraud from the Start

29.    In May and June 2006, John Bravata and Trabulsy raised $609,985 from BBC Equities' first two investors. John Bravata used $90,268 of those investment proceeds to buy himself a Ferrari, a purchase made possible only through the unwitting generosity of these two investors. Trabulsy, for his part, paid himself a handsome 21% "commission" on the second investor's $210,000 investment.

30.    John Bravata, Trabulsy, and a small number of BBC Equities and Bravata Financial employees started the scheme by orally soliciting money from 15 family members and friends, from whom Defendants raised at least $3.27 million. None of these initial investors received private placement memoranda ("PPMs") before they invested. Defendants assured these investors that their investment funds would be spent on real estate, and they that could expect annual returns of 10% or 12%.

### B.    The "Free Lunch" Seminars

31.    Next, Defendants implemented "free lunch" seminars in an effort to target wealthy senior citizens. They mailed fliers for the seminars to approximately 5,000 potential investors per location. Defendants conducted approximately 16 seminars per week, with approximately 15 to 20 potential investors attending each seminar. After the seminar, BBC Equities or Bravata Financial contacted attendees who expressed interest in investing. Some of these prospective investors received additional offering materials, including the PPMs described below.

32.     The presenters at the seminars, including John Bravata and his son Antonio, used a general script and a PowerPoint presentation. They told attendees that BBC Equities' real estate investment program provided better and safer returns than other investment options. In the earlier seminars, they boasted of guaranteed annual returns of 12%. In later seminars, they lowered the annual returns to 8%, responding to feedback from earlier participants that 12% seemed "too good to be true."

33.     At the seminars, Defendants told investors, among other things, that they could use their Individual Retirement Accounts ("IRA") to fund their BBC Equities investments. The attendees apparently took note, as more than half of the investment proceeds BBC Equities ultimately raised were conversions from investors' IRAs.

34.     John Bravata, Trabulsy, and the other presenters never told seminar attendees that: large sums of their investments would be used to pay John Bravata or Trabulsy's personal expenses; that the attendees' investment proceeds would be used in Ponzi fashion to pay the interest or dividend payments of earlier investors; that a significant portion of their investment proceeds would be used to fund the solicitation of additional investors; or, that the investors' returns were entirely dependant on Defendants' soliciting new investors to finance such distributions.

**C.    Private Placement Memoranda: Perpetuation of the Fraud**

35.     BBC Equities distributed two private placement memoranda prepared by John Sellers to certain prospective investors. However, at least 150 investors never received any PPM before investing.

36.     BBC Equities represents in the PPMs that it uses investor funds to purchase commercial, industrial, retail, multi-family and single-family real estate, vacation properties,

vacant parcels and real estate development and construction. In truth, less than 40% of investment proceeds were invested, in real estate or otherwise. Most of the remaining proceeds were misappropriated by the Senior Defendants for personal uses, were used to pay earlier investors, or were used to solicit fresh investment proceeds in order to perpetuate Defendants' scheme.

### 1.    The First PPM

37.    From February 2007 through April 2008, Defendants provided certain investors with a PPM prepared largely or entirely by John Sellers dated February 6, 2007 (the "First PPM"). The PPM offered Class B and Class C membership interests in BBC Equities, which it described as securities. The First PPM offered Class B membership interests in BBC Equities, which were not entitled to fixed annual distributions, but which were entitled to share *pro rata* with the holders of the Class A interests in profit distributions if and when declared by John Bravata and Trabulsy. The First PPM also offered Class C member interests, which yielded annual dividends of 8%, 10%, or 12%, redeemable on December 31, 2007, December 31, 2009, and December 31, 2011, respectively. During this period, Defendants raised approximately $21.2 million from at least 136 investors.

38.    The First PPM repeated the misrepresentation that investor proceeds would be used to acquire real estate. In truth, well less than half of the proceeds were used for such purposes. Moreover, the First PPM misrepresented that neither John Bravata nor Trabulsy received a salary, fee or any other compensation from BBC Equities. The First PPM capped offering expenses and organizational costs associated with the offering, which included commissions and finder's fees, at $800,000. In fact, throughout this period, John Bravata and

Trabulsy were extracting large sums of investor money to support their lavish lifestyles and to perpetuate their scheme.

## 2.    The Second PPM

39.    From April 2008 through the present, Defendants provided certain investors with a PPM prepared largely or entirely by John Sellers dated April 17, 2008 (the "Second PPM"). The offering for the Second PPM continues through April 17, 2010, pursuant to its terms. It offers Class D membership interest in BBC Equities, which it describes as securities, yielding 8% annual priority distributions. From April 2008 through July 2009, Defendants raised approximately $28.4 million from at least 369 investors. Their sales efforts apparently remained ongoing at least until the SEC lawsuit.

40.    Beyond the Senior Defendants' overarching misrepresentation in both PPMs that the investment proceeds were used to acquire real estate, the Second PPM included other specific misrepresentations about the use of such proceeds. In the Second PPM, BBC Equities represents that proceeds of the offering remaining after distributions to investors are initially held in reserve for operations and other investment activities; that until the proceeds of the Second PPM are fully invested or used in connection with BBC Equities operations, they are deposited in income producing accounts and/or invested in a manner intended to produce a return for BBC Equities; and that although John Bravata and Trabulsy historically received an 8% finder's fee for each investment they sold to BBC Equities investors, they did not receiver finder's fees for the Second PPM. None of these representations were true. In fact, BBC Equities desperately needed the investor proceeds from the Second PPM for the purpose of making good on their promised returns to earlier investors. Further, while the Second PPM noted that John Bravata and Trabulsy received salaries, it never disclosed their wholesale misappropriation of investor proceeds.

12

41.    While both PPMs stated that there is a risk that investor funds will need to be used to make the annual dividend payments to other investors – as opposed to payments being made out of BBC Equities' operating profits – such disclosures were at best half truths. In truth, this was not a risk; it was a certainty. Given BBC Equity's dire financial straits, the only way it could hope to meet its obligations to existing investors was to siphon the proceeds of new investors to pay earlier investors. In this regard, BBC Equities never disclosed to new investors that their quarterly distributions depended entirely on Defendants' solicitation of future investors to finance such distributions.

42.    The Second PPM also includes misrepresentations about BBC Equities' assets and liabilities. In the Second PPM, BBC Equities claimed that in addition to the eight properties originally contributed to BBC Equities by John Bravata and Trabulsy, BBC Equities had since acquired 28 additional real estate properties cumulatively valued at approximately $43 million, with only $34 million in mortgage debt; and that, as of February 28, 2008, BBC Equities had a Net Asset Value of $11,294,718, with total assets of $46,670,615 and total liabilities of $35,375,897. These misrepresentations grossly overvalued BBC Equities' assets and undervalued its debt. In fact, according to the Senior Defendants' own outside auditor, as of December 31, 2007, BBC Equities had total assets of $40,603,738 and total liabilities of $46,453,032.

**THE FRAUD**

**A.    Defendants' Misrepresentations on the Internet, in Advertisements, and in General Solicitations**

43.    The Senior Defendants solicited investors through the websites of BBC Equities and Bravata Financial and in paid advertisements. BBC Equities' website, launched in November 2008, included a "Fund Facts" page claiming that BBC Equities used investor proceeds to

purchase real estate, such as commercial offices, shopping centers, lifestyle malls, 150+ unit complexes, mezzanine loans, etc. Other versions of the "Fund Facts" page claimed that BBC Equities had raised over $80 million since May 1, 2006, and that the value of BBC Equities' current real estate portfolio exceeded $400 million. In fact, by then BBC Equities had yet to raise so much as $50 million. Moreover, BBC Equities' real estate portfolio was worth hundreds of millions of dollars less than BBC Equities claimed. Defendants distributed the "Fund Facts" page to investors through the mails and at the free lunch seminars.

44.    BBC Equities' and Bravata Financial's websites included an audio interview of John Bravata, during which the "interviewer" erroneously states that BBC Equities had raised over $150 million in less than a year. Instead of correcting the inaccuracy, however, John Bravata instead volunteers additional misinformation, claiming that BBC Equities had "done $400 million in the last 24 months." In a February 2009 television interview, John Bravata similarly claimed that BBC Equities had raised $1 billion from investors since November 2008. In truth, by then BBC Equities was months away from even $50 million in investor proceeds.

45.    BBC Equities' website included a profile of John Bravata falsely stating that he had published several books. If the profile is to be believed, Bravata literally wrote the book on the "*Stealing of Wealth in America.*"

46.    In December 2008, the Senior Defendants placed a paid advertisement in *Forbes* Magazine, which they also posted on BBC Equities' website and mailed to investors. The *Forbes* advertisement stated that John Bravata's net worth exceeded $54 million and, with the expectation of BBC Equities going public, was on track to reach $250 million. In fact, his true net worth never exceeded at most a few million dollars. These personal net worth figures directly tracked the equity raises of Bravata Financial and BBC Equities; BBC Equities raised $50

14

million, which is nearly equivalent to the $54 million claimed net worth of John Bravata.  In the *Forbes* advertisement, John Bravata also stated that Bravata Financial had 1,200 wealth advisers across the country and was on pace to be close to 10,000 wealth advisers within a year. This too was false. Bravata Financial never had more than approximately 50 employees.

47.     In the *Forbes* advertisement, John Bravata proclaims BBC Equities' motto as: "Safety first, returns second." Both in that advertisement and in a subsequent television interview, John Bravata claims that he only gets paid if BBC Equities earns a profit, and if the investors make money.

**B.     Defendants' Misuse and Misappropriation of Investor Funds**

48.     Precisely the opposite was true. While John Bravata and Trabulsy have enriched themselves and the Bravata family handsomely, they have done so to the detriment and at the expense of BBC Equities' investors. The Senior Defendants have misappropriated at least $7.2 million for their personal use, and for the use of Shari and Antonio Bravata – even though BBC Equities has never been profitable.

**1.     John Bravata's Misappropriation of Investors' Proceeds**

49.     John Bravata has used the money that he misappropriated from the BBC Equities' investors to, among other things: (a) purchase a $90,268 Ferrari on June 15, 2006; (b) cause BBC Equities to spend at least $936,665 on the rent and mortgage payments for John and Shari Bravata's $6 million vacation home, which the First PPM identified as one of BBC Equities' investment properties; (c) cause BBC Equities to spend $762,586 towards building a new luxury residence for John and Shari Bravata; (d) buy an $84,902.50 Maserati luxury car for Shari Bravata; (e) buy at least $28,000 and $59,000 in jewelry, respectively, for himself and Shari Bravata; (f) pay a $46,566 down payment on a $500,000 catamaran, along with Trabulsy; (g)

purchase a $50,000 pleasure boat; (h) spend at least $27,500, exclusive of airfare, on hunting vacations in Russia and Canada; (i) make a total of $35,144 in lease payments on a 2007 Cadillac Escalade that John Bravata acquired from Trabulsy in August 2007; (j) make the monthly loan payments on a $52,335 2006 Corvette that John Bravata acquired from Trabulsy in September 2007; and (k) purchase a $10,000 used Ferrari.

50.    John Bravata and Shari Bravata also have made over $315,000 in purchases for their own benefit using BBC Equities' corporate credit card. John Bravata charged BBC Equities' credit card for: (a) over $115,000 in artwork; (b) $47,253 for an item categorized as "shipboard charges"; (c) $29,500 on automotive improvements from a sports car restoration facility; (d) $26,670 for medical treatments at an "anti-aging" facility; and, (e) $4,900 for jewelry. In addition to these charges, Shari Bravata has charged BBC Equities' credit cards more than $28,883 for personal expenditures such as travel, clothing, and dining. The Bravatas have yet to reimburse BBC Equities or its investors for any of these charges.

51.    In total, throughout the BBC Equities' offerings, John Bravata and Shari Bravata have used more than $4.68 million of investor funds for their own benefit.

52.    It is only because John Bravata misappropriated investor proceeds that the Bravatas had sufficient funds to make these purchases and acquisitions.

**2.    Trabulsy's Misappropriation of Investors' Proceeds**

53.    Trabulsy has similarly misappropriated millions of dollars of investor proceeds from BBC Equities. Among other things, Trabulsy has used such funds to: (a) withdraw $297,000 in cash; (b) pay over $200,000 in personal expenditures through a BBC Equities credit card, including charging at least $80,000 for trips to Las Vegas and casinos in Detroit, and charging $19,600 for jewelry; (c) wire $90,000 to the Wynn Casino in Las Vegas; (d) pay over

$91,000 in rent and mortgage payments on his $1.17 million personal residence; (e) pay $36,503 in lease payments on a Mercedes Benz S550 luxury car; (f) make $22,558 in monthly payments on the Escalade and Corvette described above, before he transferred the vehicles to John Bravata; (g) make the lease payments on a 2007 GMC Denali luxury SUV; and (h) purchase, along with John Bravata, the $500,000 catamaran.

54.      It is only because Trabulsy has misappropriated investor proceeds that he has had sufficient funds to make these purchases and acquisitions.

### 3.      Antonio Bravata's Use of Investors' Proceeds

55.      Throughout the BBC Equities' offerings, Antonio Bravata has used more than $444,384 in investor funds for his own benefit, including to (a) make a $22,000 down payment and subsequent $2,193.33 monthly land sale contract payments on a $398,000 house; (b) make a $30,000 down payment and subsequent $2,700 monthly mortgage payments on his current personal residence; (c) make a $28,744 down payment on an $119,900 Ferrari; (d) buy a Nissan SUV for $24,726.16; (e) make a $5,400 down payment and subsequent $819.97 monthly payments on a $42,887 Corvette (that Antonio Bravata subsequently sold before purchasing the aforementioned Ferrari); (f) buy a Honda sport motorcycle for $6,974.73; and (g) make a $12,000 down payment and subsequent monthly payments for a $42,000 Hummer SUV.

56.      It is only because of the misappropriation of investor proceeds that Antonio Bravata has been able to make the aforementioned purchases and acquisitions.

### C.    The Senior Defendants Use BBC Equities Investment Proceeds to Pay Transaction-Based Compensation for the Purpose of Soliciting New Investors

57.      Investors unknowingly paid millions of dollars of additional investment proceeds to perpetuate the Senior Defendants' Ponzi scheme. BBC Equities paid over $2.1 million in purported "commissions" or "finder's fees" to its sales agents, including payments to John

Bravata, Trabulsy, Antonio Bravata, Aaron Simon, and John Sellers for soliciting investments. Bravata Financial's unregistered brokers and sales agents had monthly BBC Equities sales quotas, and were paid commissions for sales of BBC Equities securities in excess of those quotas. After June 2008, BBC Equities paid Bravata Financial $7.22 million as reimbursement for employee compensation, $1.6 million of which John Bravata and Trabulsy kicked back to their personal bank accounts. Defendants never told investors about such exorbitant marketing expenses.

58.    BBC Equities' investors also paid $5.3 million to "BBC Management, Inc.," an entity that John Bravata and Trabulsy created to manage BBC Equities' real estate portfolio and to support its solicitation of new investors.

**D.    By July, 2009, The Only Way for Defendants to Avert BBC Equities' Collapse was to Immediately Solicit Millions of Dollars in New Investor Proceeds**

59.    As a result of the Senior Defendants' misappropriation of investor proceeds, no more than $20.7 million of the more than $50 million BBC Equities raised has been spent acquiring real estate. Even that modest real estate portfolio is leveraged with debilitating debt, amounting to over $128 million in mortgages and other liabilities.

60.    According to its own financial statements, as of December 31, 2008, BBC Equities had a negative net worth, with purported assets of $146,493,312 and liabilities of $158,005,354. Its operating expenses for 2008 were a staggering $3,896,245. For the first five months of 2009, BBC Equities' real estate operations generated revenues of only $552,219, with expenses of nearly $6 million.

61.    In short, the Senior Defendants have run BBC Equities into the ground. Their malfeasance has rendered it financially insolvent.

62.     On March 30, 2009, the Michigan Office of Financial and Insurance Regulation ("OFIR") issued an order requiring BBC Equities and Bravata Financial to cease-and-desist from offering unregistered securities or acting as broker-dealers in the state of Michigan (the "OFIR Order").

63.     In blatant violation of the OFIR Order, after its issuance, John Bravata instructed unregistered brokers from at least one Bravata Financial branch office to continue accepting proceeds from Michigan investors. On information and belief, he directed his employees to have potential investors leave the date blank on certain BBC Equities offering materials, thereby enabling such materials to be backdated.

64.     Since the OFIR Order, BBC Equities' decline has continued. As of June 10, 2009, BBC Equities only had $131,316 in available cash. On July 8, 2009, the United States District Court, Northern District of Ohio, entered a $4.18 million judgment against BBC Equities and Trabulsy, jointly and severally, as guarantors of a defaulted promissory note relating to one of BBC Equities' purported investment properties. Neither Trabulsy nor BBC Equities has the means to repay this note. On July 16, 2009, the plaintiff bank in the above-referenced lawsuit filed an action in this District alleging that John Bravata is also liable as a guarantor on the same defaulted promissory note. John Bravata is financially unable to repay the note.

65.     Further, BBC Equities owes its investors more than $1 million in quarterly dividends – money it does not have.

66.     In a desperate attempt to raise cash, BBC Equities has put some of its more valuable properties on the market, further diminishing any hope of future profitability.

67.      Prior to the SEC's lawsuit, Bravata and Trabulsy had apparently hatched a plan to salvage and perpetuate their Ponzi scheme. In furtherance of their plan, they recently formed a

new related company referred to as either BBC Capital, LLC ("BBC Capital") or Phoenix Venture Capital, LLC ("Phoenix"). Their plan appeared to involve this new company assuming ownership of Bravata Financial and other related entities. In a February 2009 television interview, John Bravata described BBC Capital as a venture capital fund and holding company for BBC Equities and Bravata Financial. In late June or early July, 2009, Trabulsy gave a radio interview promoting Phoenix. John Bravata and Trabulsy have stated that they intend to use BBC Capital or Phoenix to start a new offering to investors through a forthcoming private placement. Also, upon information and belief, Defendants have transferred assets to and between the 50 BBC Holdings, the XI BBC Holdings, and Ferndale Lofts, all in an effort to keep their scheme afloat, hide assets, and protect their ill-gotten gains.

### AARON SIMON, EQUITY TRUST COMPANY, AND THE PLAINTIFF'S LOSS

68.    Lincoln Crocker was friends with a longtime associate of John Bravata's. In or around 2006, this associate, Aaron Simon, (the "Agent") became employed by one of the Corporate Defendants.

69.    The Agent, acting within the scope of his employment by the Corporate Defendant, began soliciting Mr. Crocker to invest in BBC Equities.

70.    On several occasions, the Agent provided Mr. Crocker with copies of the other Defendants' misleading sales literature and materials.

71.    For a long while, despite these persistent entreaties, Mr. Crocker resisted. However, the Agent represented to Crocker he had performed extensive due diligence on BBC Equities, including but not necessarily limited to having a controller  diligently review the Defendants' books, and by having an independent real estate expert review BBC Equity's investment holdings.

72.    The Agent provided Mr. Crocker with a copy of the Second PPM.

73.    The Agent represented to Mr. Crocker that he was Mr. Crocker's personal investment advisor and that they had a fiduciary relationship.

74.    During these solicitations, the Agent had a personal financial interest in Mr. Crocker investing in BBC Equities, since the Agent was paid a commission for his sales.

76.    The Agent solicited several other members of the Class to invest in BBC Equities and otherwise materially participated in the sale of shares of BBC Equities to members of the Class, and, as an employee of Bravata Financial, and Kalamazoo Branch Manager for Bravata Financial, he directed other employees of one or more Corporate Defendants as they solicited investments in BBC Equities from members of the Class and/or otherwise materially participated in the sale of shares of BBC Equities to Class members.

75.    Based upon these representations, beginning on or around August 21, 2008, Mr. Crocker invested approximately $250,000 in BBC Equities.  Specifically, he ordered the funds from  his 401k account of about $150,000 transferred electronically into BBC Equities, and transferred by check approximately $100,000 into BBC Equities' Class D shares, which Crocker also understood to go by name the "Bravata Financial" fund.  According to BBC Equity's records, the non-IRA funds were deposited on August 22, 2008. and the IRA funds were deposited on October 14, 2008.  These monies constituted Mr. Crocker's entire retirement nest egg.

76.    Mr. Crocker's approximately $150,000 IRA rollover was performed by BBC Equities' handpicked fund custodian, Equity Trust Company. One of the Corporate Defendants handled all of the interactions with Equity Trust Company, and Mr. Crocker never had any contact with Equity Trust Company.  This pattern was repeated for other members of the Class;

in fact, Equity Trust Company was one of the only IRA fund custodians used by BBC Equities, meaning that Equity Trust Company had a near-exclusive or exclusive arrangement with one or more Corporate Defendants whereby the Corporate Defendant would funnel clients solely to Equity Trust Company, with Equity Trust Company then establishing an IRA for each client. Through this system, Equity Trust Company, which represented itself as Plaintiffs' fund custodian and agent, served as the agent of a Corporate Defendant, and actually effected the Plaintiffs' purchases of shares in BBC Equities and the Corporate Defendant's sale of such shares. Equity Trust Company remained the custodian for the funds after they were invested in BBC Equities, and profited from handling Mr. Crocker's and other Class members' funds.

77.    Equity Trust Company holds itself out as a secure choice for custody of retirement investment accounts, boasting on its web site of the "high standards for IRA custodians," a "well-established system of internal controls," and "investment protection." But, despite the duties that Equity Trust Company owed Mr. Crocker and other Class members as the custodian of their retirement accounts, it agreed to serve as BBC Equities' agent and retirement fund custodian despite the fraudulent nature of BBC Equities' investment scheme, and it failed to provide any assistance to Mr. Crocker or other Class members after the severe problems with BBC Equities became apparent.

78.    After the OFIR Order, Mr. Crocker grew increasingly concerned about the safety of his investment with Defendants. On or about May 19, 2009, he provided a written request to Defendants for the distribution – that is, return to him – of his investment.

79.    Defendants responded that such distribution would take 60 days to complete.

80.    Equity Trust Company failed to assist Mr. Crocker or other Class members in redeeming their investments in BBC Equities, even though it served as custodian of the shares.

81.    Over the next 60 days, Mr. Crocker attempted to contact Defendants several times, without success.  Eventually, on or about the 60th day after the distribution request, John Bravata's brother Joe Bravata finally returned one of Mr. Crocker's telephone calls.  Joe Bravata said that the money was "coming," and that John Bravata was in charge of disbursements and would call Mr. Crocker "the first of [the] next week."  To date, John Bravata has not called, and Mr. Crocker has not received his money.

## COUNT I

### VIOLATIONS OF SECTION 12(a)(1) THE SECURITIES ACT
### (Regarding Defendants John J. Bravata, James Joe Bravata, Richard J. Trabulsy, Antonio M. Bravata, the Corporate Defendants, Aaron Simon, Equity Trust Company, and John Sellers)

82.    Paragraphs 1 through 81 above are realleged and incorporated herein by reference.

83.    By their conduct, these defendants directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

84.    No valid registration statement was filed or was in effect with the Commission in connection with these defendants' offer and sale of securities of BBC Equities.

85.     By reason of the foregoing, these defendants have violated Sections 5(a) and (c) of the Securities Act (15 U.S.C. § 77e(a) and (c)).

86.     These defendant's violations have caused Plaintiff and other members of the Class to suffer a substantial loss.

87.     Under Section 12(a)(1) of the Securities Act of 1933 (15 U.S.C. § 77l(a)(1)), these defendants are liable to Plaintiff and the Class for such actions.

**COUNT II**

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT (15 U.S.C. §78j(b)) AND RULE 10b-5 THEREUNDER (17 C.F.R. § 240.10b-5)**
**(Regarding Defendants John J. Bravata, Richard J. Trabulsy, James Joe Bravata, the Corporate Defendants, and John Sellers)**

88.     Paragraphs 1 through 87 above are realleged and incorporated herein by reference.

89.     By their conduct, these defendants, in connection with the purchase or sale of BBC Equities' securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

90.     These defendants acted with scienter.

91.     In ignorance of the materially false and misleading nature of these defendants' statements, Plaintiff and the other members of the Class purchased BBC Equity securities.  But

for the fraud alleged herein, Plaintiff and other Class members would not have purchased the securities.

92.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of their BBC Equity securities.

93.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged to be materially false and misleading.

94.    By virtue of the foregoing, these defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT III

### VIOLATIONS OF SECTION 15 THE SECURITIES ACT (15 U.S.C. § 77o)
### (Regarding Defendants John J. Bravata, James Joe Bravata, John Sellers, Richard J. Trabulsy, Antonio M. Bravata, Aaron Simon, and the Corporate Defendants)

95.    Paragraphs 1 through 94 above are realleged and incorporated herein by reference.

96.    These defendants, at the time that the unregistered securities were sold, conducted and participated, directly and indirectly, in the operation and management of the Corporate Defendants.

97.    Because of their positions of control and authority over the Corporate Defendants, these defendants were able to, and did, control the security registration process.

98.    Therefore, these defendants were controlling persons of the Corporate Defendants within the meaning of Section 15 of the Securities Act, and are liable for the Corporate Defendants' violations of Section 12 of the Securities Act, as alleged in the First Claim for Relief, above.

## COUNT IV

### RELIEF AS TO DEFENDANT SHARI BRAVATA

99.    Paragraphs 1 through 98 above are realleged and incorporated herein by reference.

100.    Altogether, the Senior Defendants received over $50 million in ill-gotten funds through their illegal offering of securities.

101.    The Senior Defendants used at least $1,872,000 of BBC Equities investor funds to acquire the assets described above for Shari Bravata's benefit.

102.    Shari Bravata currently possesses or controls investor funds and assets purchased with investor funds.

103.    The offering proceeds that Shari Bravata received from the Senior Defendants and currently possesses or controls constitute ill-gotten gains.

104.    Shari Bravata has no legitimate claim to the ill-gotten funds that she received from the Senior Defendants or to any assets that the she acquired or that the Senior Defendants acquired for her with those ill-gotten funds.

105.    Rather, the ill-gotten funds rightfully belong to the Plaintiff and other Class members.

## COUNT V

### INTENTIONAL FRAUD
**(Regarding Defendants John J. Bravata, Richard J. Trabulsy, John Sellers, James Joe Bravata, and the Corporate Defendants)**

106.    Paragraphs 1 through 105 above are realleged and incorporated herein by reference.

107. These defendants made several misrepresentations to the public at large and to Mr. Crocker and other Class members as set forth above.

108. These defendants knew that these statements were false when they made them.

109. These defendants intended for Plaintiff and the Class members to rely upon their false statements.

110. Plaintiff and Class members did rely on these defendants' false statements, and would never have invested in BBC Equities were it not for the false statements.

111. These defendants have enjoyed substantial financial gain, and Plaintiff and other Class members have suffered severe financial loss, as a result of Plaintiff's and Class members' reliance on the false statements.

## COUNT VI

### NEGLIGENT MISREPRESENTATION
### (Regarding the Senior Defendants)

112. Paragraphs 1 through 111 above are realleged and incorporated herein by reference.

113. These defendants made several misrepresentations to the public at large and to Mr. Crocker and the members of the Class as set forth above.

114. These defendants should have known that these statements were false when they made them.

115. These defendants intended for Plaintiff and the Class members to rely upon their false statements.

116. Plaintiff and the Class members did rely on these defendants' false statements, and would never have invested in BBC Equities were it not for the false statements.

117.    These defendants have enjoyed substantial financial gain, and Plaintiff and other Class members have suffered severe financial loss, as a result of Plaintiff's and Class members' reliance on the false statements.

## COUNT VII

### SILENT FRAUD
### (Regarding the Senior Defendants)

118.    Paragraphs 1 through 117 above are realleged and incorporated herein by reference.

119.    These defendants made several representations to the public at large and to Mr. Crocker and the Class members as set forth above; having done so, they had an obligation to inform Plaintiff and the Class members that they were in fact diverting money from BBC Equities for their personal use and running a Ponzi scheme.

120.    These defendants never disclosed these facts to Plaintiff or to other Class members, despite the fact that they knew them to be true.

121.    These defendants intended for Plaintiff and the Class members to rely upon their silence as to these important facts.

122.    Plaintiff and the Class members did rely on these defendants' silence, and would never have invested in BBC Equities had they known the truth about the operation.

123.    These defendants have enjoyed substantial financial gain, and Plaintiff and the Class members have suffered severe financial loss, as a result of Plaintiff's and the Class members' reliance on the these defendants' failure to inform them of these salient facts about BBC Equities.

## COUNT VIII

### NEGLIGENCE
**(Regarding the Senior Defendants.)**

124.    Paragraphs 1 through 123 above are realleged and incorporated herein by reference.

125.    These defendants owed Mr. Crocker and the other members of the Class a duty to direct the Plaintiff's and Class members' funds to proper investment vehicles, and/or to properly oversee their investments.

126.    These breached this duty by directing the Plaintiff's and the other Class members' investments into a mismanaged investment scheme, and by mismanaging the investments.

127.    As a result of these defendants' negligence in investing Plaintiff's and Class members' funds in BBC Equities and in mismanaging BBC Equities, Mr. Crocker and others similarly situated have suffered financial loss.

## COUNT IX

### BREACH OF FIDUCIARY DUTY
**(Regarding the Senior Defendants)**

128.    Paragraphs 1 through 127 above are realleged and incorporated herein by reference.

129.    These defendants owed Mr. Crocker and other members of the Class a fiduciary duty, for reasons including, but not limited to, the fact that they held themselves out as investment advisors to Plaintiff and the other Class members, and the fact that they purported to serve Plaintiff and other Class members as competent custodians of their investments and as participants in a common investment venture.

130.    These defendants breached this fiduciary duty by investing Mr. Crocker and other Class members' money in a ponzi scheme; failing to perform adequate due diligence on BBC Equities; mismanaging BBC Equities; withdrawing funds from BBC Equities for personal use; and by profiting from these things at Mr. Crocker and other Class members' expenses.

131.    As a result of the Agent's breach of fiduciary duty, Mr. Crocker and other members of the Class have suffered substantial financial losses.

## COUNT X

### INTENTIONAL FRAUD
### (Regarding Defendant Aaron Simon.)

132.    Paragraphs 1 through 131 above are realleged and incorporated herein by reference.

133.    The Agent made several misstatements to Plaintiff and other members of the Class, including but not limited to his claims that BBC Equities' books were in order.

134.    The Agent also adopted several misstatements made by the other Defendants, by providing Plaintiff and other members of the Class with promotional materials including but not limited to the second PPM.

135.    The Agent made these misrepresentations in order to induce Plaintiff and other members of the Class to invest in BBC Equities.

136.    The Agent knew, or should have known, that these representations were false when he made them.

137.    Plaintiff and other members of the Class relied upon these misrepresentations, and would not have invested in BBC Equities were it not for the misrepresentations.

138.    The Agent has financially benefitted from Plaintiff's and other members of the Class' investment in the securities, and Plaintiff has suffered financially from his investment.

## COUNT XI

### NEGLIGENT MISREPRESENTATION
### (Regarding Defendant Aaron Simon.)

139.    Paragraphs 1 through 138 above are realleged and incorporated herein by reference.

140.    The Agent made several misstatements to Plaintiff and other members of the Class, including but not limited to his claims that BBC Equities' books were in order.

141    The Agent also adopted several misstatements made by the other Defendants, by providing Plaintiff and other members of the Class with promotional materials and the second PPM.

142.    The Agent made these misrepresentations in order to induce Plaintiff and other members of the Class to invest in BBC Equities.

143.    The Agent knew, or should have known, that these representations were false when he made them.

144.    Plaintiff and other members of the Class relied upon these misrepresentations, and would not have invested in BBC Equities were it not for the misrepresentations.

145.    The Agent has financially benefitted from Plaintiff's and other members of the Class' investment in the securities, and Plaintiff and other members of the Class have suffered financially from their investment.

## COUNT XII

### SILENT FRAUD
### (Regarding Defendant Aaron Simon.)

146.    Paragraphs 1 through 145 above are realleged and incorporated herein by reference.

147.     The Agent made several affirmative statements to Plaintiff and other members of the Class regarding the desirability of investing in BBC Equities, and provided Plaintiff with promotional materials and the second PPM.

148.     Having done so, the Agent was obligated to inform Plaintiff and other members of the Class of the true nature of BBC Equities: that it was indeed "to good to be true," and was in fact a fraud run for the benefit of the Defendants.

149.     The Agent knew, or should have known, that these omissions rendered his affirmative statements misleading.

150.     Plaintiff and other members of the Class did not know, and could not reasonably have known, the truth of these omitted statements; relied upon the statements that were rendered misleading by the omissions, and would not have invested in BBC Equities if the omitted information had been revealed.

151.     The Agent has financially benefitted from Plaintiff's and other members of the Class' investment in the securities, and Plaintiff and other members of the Class have suffered financially from their investment.

## COUNT XIII

### BREACH OF FIDUCIARY DUTY
### (Regarding Defendant Aaron Simon.)

152.     Paragraphs 1 through 151 above are realleged and incorporated herein by reference.

153.     The Agent owed Mr. Crocker and other members of the Class a fiduciary duty, and in fact expressly told Mr. Crocker that he was his fiduciary.

154.     The Agent breached this fiduciary duty by soliciting Mr. Crocker and other members of the Class to invest in a ponzi scheme; failing to perform adequate due diligence on

BBC Equities; providing false information to Mr. Crocker and other Class members regarding BBC Equities; and by profiting from the exchange at Mr. Crocker's and other Class members' expense.

155.    As a result of the Agent's breach of fiduciary duty, Mr. Crocker and other members of the Class have suffered substantial financial loss.

## COUNT XIV

### BREACH OF AGENCY
### (Regarding Defendant Aaron Simon.)

156.    Paragraphs 1 through 155 above are realleged and incorporated herein by reference.

157.    The Agent served as Mr. Crocker's and other members of the Class's agent for purposes of Mr. Crocker's and other members of the Class's investments with BBC Equities.

158.    The Agent breached his duty as such by soliciting Mr. Crocker and other members of the Class to invest in a ponzi scheme; failing to perform adequate due diligence on BBC Equities; providing false information to Mr. Crocker and other members of the Class regarding BBC Equities, and by profiting from the exchange at Mr. Crocker's and other members of the Class's expense.

159.    As a result of the Agent's breach of duty, Mr. Crocker and other members of the Class have suffered substantial financial loss.

## COUNT XV

### NEGLIGENCE
### (Regarding Defendant Equity Trust Company.)

160.    Paragraphs 1 through 159 above are realleged and incorporated herein by reference.

161.    Equity Trust Company owed Mr. Crocker and and other members of the Class a duty to properly oversee their retirement investments.

162.    Equity Trust Company breached this duty by using Mr. Crocker's and other members of the Class's retirement savings to purchase an interest in BCC Equities on their behalf.

163.    Equity Trust Company owed Mr. Crocker and other members of the Class a duty of care to properly administer their retirement accounts by properly effecting the liquidation their BBC Equities interests and distributing the proceeds to the investors.

164.    Equity Trust Company breached this duty by failing to effect the liquidation of Mr. Crocker's and  and other members of the Class' interests in BBC Equities and by failing to distribute the proceeds to the investors.

165.    As a result of Equity Trust Company's negligence in investing its clients' funds in BBC Equities and in failing to effect the liquidation of its clients' interests in BBC Equities, Mr. Crocker and other members of the Class have suffered financial loss.

## COUNT XVI

### BREACH OF FIDUCIARY DUTY
### (Regarding Defendant Equity Trust Company)

166.    Paragraphs 1 through 165 above are realleged and incorporated herein by reference.

167.    Equity Trust Company owed Mr. Crocker and other members of the Class a fiduciary duty.

168.    Equity Trust Company breached this fiduciary duty by investing Mr. Crocker and other Class members' money in a ponzi scheme; failing to perform adequate due diligence on

BBC Equities; and by profiting from these exchanges at Mr. Crocker and other Class members' expense.

169.    As a result of the Agent's breach of fiduciary duty, Mr. Crocker and other members of the Class have suffered substantial financial losses.

## COUNT XVII

### BREACH OF AGENCY
### (Regarding Defendant Equity Trust Company.)

170.    Paragraphs 1 through 169 above are realleged and incorporated herein by reference.

171.    Equity Trust Company served as Mr. Crocker and other Class members' agent for purposes of  their investments with BBC Equities.

172.    Equity Trust Company breached its duty as such by investing Mr. Crocker and other Class members money in a ponzi scheme; failing to perform adequate due diligence on BBC Equities; and by profiting from these exchanges at Mr. Crocker and other Class members' expense.

173.    As a result of the Agent's breach of duty, Mr. Crocker and other Class members have suffered substantial financial losses.

## COUNT XVIII

### SALE OF A SECURITY BY MEANS OF UNTRUE STATEMENTS IN VIOLATION OF MICHIGAN'S UNIFORM SECURITIES ACT
### (Regarding Defendants John J. Bravata, Richard J. Trabulsy, Antonio M. Bravata, James Joe Bravata, John Sellers, Equity Trust Company, Aaron Simon, and the Corporate Defendants)

174.    Paragraphs 1 through 173 above are realleged and incorporated herein by reference.

175.   The investments offered by BBC Equities and sold to Plaintiff and the Class members constitute securities under Michigan's Uniform Securities Act, MCL 451.501 *et seq.* (the "Michigan Act").

176.   These defendants made untrue statements of materials facts to Plaintiff and the Class members regarding the securities, and knew that these representations were false when they made them.

177.   These defendants made these untrue statements of material facts to Plaintiff and the Class members as a means to offer or sell a security – namely, the investments in BBC Equities.

178.   Neither Plaintiff nor any of the Class members knew that these statements were untrue, and none of them could have known of the untruth in the exercise of reasonable care.

179.   As a result of these defendants' untrue statements of material facts in the offering or sale of a security, Plaintiff and the Class members have suffered considerable financial loss.

## COUNT XIX

### SALE OF A SECURITY BY OMISSION OF MATERIAL FACTS IN VIOLATION OF THE MICHIGAN ACT
**(Regarding Defendants John J. Bravata, Richard J. Trabulsy, Antonio M. Bravata, Aaron Simon, James Joe Bravata, John Sellers, Equity Trust Company, and the Corporate Defendants)**

180.   Paragraphs 1 through 179 above are realleged and incorporated herein by reference.

181.   These defendants, in offering securities for sale to Plaintiff and the Class members, made statements regarding the soundness and performance of investments in BBC Equities.  Having done so, under the circumstances in which the statements were made, they had

an obligation to inform Plaintiff and the Class members that some or all of the Defendants were in fact diverting money from BBC Equities for their personal use and running a Ponzi scheme.

182.    These defendants' omission of these material facts rendered these defendants' statements misleading.

183.    Neither Plaintiff nor any of the Class members knew these omitted materials facts, and could not have known them in the exercise of reasonable care.

184.    As a result of these defendants' omission of material facts in the offering or sale of a security, Plaintiff and the Class members have suffered considerable financial loss.

## COUNT XX

### SALE OF AN UNREGISTERED SECURITY REQUIRED TO BE REGISTERED BY THE MICHIGAN ACT
### (Regarding Defendants John J. Bravata, Richard J. Trabulsy, Antonio M. Bravata, Aaron Simon, James Joe Bravata, John Sellers, Equity Trust Company, and the Corporate Defendants)

185.    Paragraphs 1 through 184 above are realleged and incorporated herein by reference.

186.    These defendants failed to register the investments in BBC Equities with the State of Michigan or any division thereof as securities, despite the Michigan Act's requirement that all non-exempt securities be registered with the state.

187.    The investments in BBC Equities did not under any exemption to the Michigan Act's registration requirement.

188.    As a result of Plaintiff's and the Class members' purchases of these unregistered securities, they have suffered considerable financial loss.

## COUNT XXI

### VIOLATION OF 18 U.S.C. § 1962(c)
### (Regarding Defendants John J. Bravata, Richard J. Trabulsy, James Joe Bravata, John Sellers, and the Corporate Defendants)

189.    Paragraphs 1 through 188 above are realleged and incorporated herein by reference.

190.    The BBC Equities fraudulent investment scheme as set forth in this Complaint (the "Enterprise") is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of these defendants as the Enterprise's members.  The Enterprise is an organization, functioning as an ongoing and continuing unit that was created or used as a tool by these defendants in order to effectuate through the pattern of racketeering activity as alleged in this Complaint and achieve the common goals of financial gain from investors' proceeds.  These defendants are each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3), and they are each a "person" distinct from one another.

191.    Defendants' racketeering activities as described in this Complaint amounted to a common course of conduct, which the Enterprise intended to deceive and harm Plaintiff and the Class Members.  Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class.  These defendants racketeering activities were part of its ongoing business and constituted a continuing threat to the property of Plaintiff and the Class, at least until the time of the SEC lawsuit.  The Enterprise functioned as a continuing unit with each member of the Enterprise knowing its (or their) role and performing its part or role to assure the Enterprise's continued success.

192.    Members of the Enterprise participated together in the fraudulent scheme as described above in this Complaint.  These defendants conducted the affairs of the fraudulent investment scheme set forth above through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), in that they intentionally employed a scheme or artifice to defraud Plaintiff and the Class using the mails or wires in furtherance of that scheme.

193.    The sale of investments in BBC Equities, in the manner described in this Complaint, engaged in and affected interstate commerce.

194.    One or more of these defendants exerted sufficient control over the Enterprise so that they were able to direct and conduct the affairs of the Enterprise.

195.    These defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that included acts indictable under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) as described in this Complaint.

196.    These defendants' use of the U.S. Mail and wires in furtherance of the Enterprise involved thousands of communications, including, but not limited to:

a.    communications between each other and the other Defendants in furtherance of their scheme;

b.    communications including financial payments by these defendants in furtherance of the activities of the fraudulent scheme, including payments for the minimal investments that BBC Equities actually made as a "fig leaf" for the widespread fraud and diversions from the Corporate Defendants to other Defendants' personal accounts for their personal use;

c.    communications between one or more of these Defendants and the Class members including mailing investment-related materials, receiving payments from Plaintiff and

the Class members in the mail or through the wires, and establishing accounts *via* the mails and wires, encompassing hundreds of similar communications in furtherance of the fraud as detailed above in this Complaint;

        d.    communications between the these defendants and Equity Trust Company regarding Plaintiffs' retirement accounts;

        e.    communications between these defendants and their agents, such as Aaron Simon.

197.    Defendant BBC Equities also maintained a website through which it communicated with Plaintiff and Members of the Class.

198.    These defendants also used the U.S. Mail and wires to run its extensive promotional campaign to solicit new "investments" from Class members.

199.    Plaintiff and the Class members have been injured in their property by reason of the violations alleged in this Complaint in that Plaintiff and the Class members have invested millions of dollars in now apparently worthless shares of BBC Equities that they would not have bought had these defendants not engaged in their pattern of racketeering activity.

200.    The injuries to Plaintiff and the Class members were directly and proximately caused by these defendants' racketeering activity as described above.

201.    By virtue of these violations of 18 U.S.C. § 1962(c), these defendants are liable to Plaintiff and the Class members for three times the damages Plaintiff and the Class members have sustained, plus the cost of this suit, including reasonable attorney's fees.

## COUNT XXII

### VIOLATION OF 18 U.S.C. § 1962(a)
### (Regarding the Executive Defendants)

202.    Paragraphs 1 through 201 above are realleged and incorporated herein by reference.

203.    The Corporate Defendants are limited liability companies controlled by the Executive Defendants, who also retain substantial interests in the Corporate Defendants.

204.    The Executive Defendants received, and may still receive, income from the pattern of racketeering described in this Complaint.

205.    The Executive Defendants used and invested the income from the pattern of racketeering activity alleged in this Complaint to invest in the operation of the Corporate Defendants in order to perpetuate their fraudulent scheme.

206.    The Enterprise described in this Complaint affected and continues to affect interstate commerce.

207.    By virtue of these violations of RICO, 18 U.S.C. § 1962(a), Plaintiff and the Class members were injured in their property by the Executive Defendants' use and investment of racketeering income, and the Executive Defendants are liable to Plaintiff and the Class members for three times the damages Plaintiff and the Class have sustained, plus costs of this suit and reasonable attorneys' fees.

## COUNT XXIII

### VIOLATION OF 18 U.S.C. § 1962(b)
### (Regarding the Executive Defendants)

208.    Paragraphs 1 through 207 above are realleged and incorporated herein by reference.

209.    The Corporate Defendants are limited liability companies controlled by the Executive Defendants, who also retain controlling interests in the Corporate Defendants.

210.    The Executive Defendants received, and may still receive, income from the pattern of racketeering described in this Complaint.

211.    The Executive Defendants used and invested the income from the pattern of racketeering activity alleged in this Complaint to invest in the operation of the Corporate Defendants in order to perpetuate the Enterprise.

212.    The Enterprise affected and continues to affect interstate commerce.

213.    By virtue of these violations of RICO, 18 U.S.C. § 1962(b), Plaintiff and the Class members were injured in their property by the Executive Defendants' use and investment of racketeering income, and the Executive Defendants are liable to Plaintiff and the Class members for three times the damages Plaintiff and the Class members have sustained, plus costs of this suit and reasonable attorneys' fees.

**COUNT XXIV**

**VIOLATION OF 18 U.S.C. § 1962(d)**
**(regarding all Defendants)**

214.    Paragraphs 1 through 213 above are realleged and incorporated herein by reference.

215.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

216.    Defendants have violated § 1962(d) by conspiring to violate RICO, 18 U.S.C. § 1962(c), as alleged in this Complaint.  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of affairs of the Enterprise through a pattern of racketeering activity.

217. Defendants, as co-conspirators, have engaged in numerous overt acts in furtherance of the conspiracy as described in this Complaint, including multiple instances of mail and wire fraud violations, including but not limited to:

a.    knowingly soliciting "investors" for BBC Equities;

b.    knowingly serving as a fund custodian for BBC Equities' "investors" and providing the victims' money with BBC Equities;

c.    knowingly transferring money from the Corporate Defendants to individuals for their personal use;

d.    knowingly communicating by mail and wire with Plaintiff and the Class members to maintain accounts and solicit further payments to BBC Equities; and

e.    collecting, transferring, and hiding shared revenues.

218. The nature of the above-described co-conspirators' acts in furtherance of the conspiracy gave rise to a plausible inference that each of the Defendants agreed to the objective of violating RICO, 18 U.S.C. § 1962(c), and that by conspiring to violate RICO, 18 U.S.C. § 1962(c), they were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

219. Plaintiff and the Class members have been injured in their property by reason of the conspiracy alleged herein in that Plaintiffs and the Class members have provided funds to BBC Equities that have been apparently lost to the Enterprise, and that Plaintiff and the Class would not have paid had Defendants not conspired to violate RICO, 18 U.S.C. § 1962(c).

220. The injuries of Plaintiffs and the Class members were directly and proximately caused by the conspiracy to violate RICO, 18 U.S.C. § 1962(c), as described above.

221. By virtue of these violations of RICO, 18 U.S.C. §1962(d), Defendants are liable to Plaintiff and the Class members for three times the damages Plaintiffs and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT XXV

## ACCOUNTING
### (Regarding the Senior Defendants, Antonio Bravata, and Shari Bravata)

222. Paragraphs 1 through 222 above are realleged and incorporated herein by reference.

223. These defendants (the "Accounting Defendants") received funds either directly or indirectly from Plaintiff and the other member of the Class,

224. Defendants, though their promotional materials, PPMs, and otherwise, represented that these funds would be used for business purposes and would be a good investment for Plaintiff and the other members of the Class.

225. In fact, only a small portion of the funds were used for business purposes, and Defendants in fact used the money for extravagant personal purchases.

226. Defendants also produced misleading financial statements that purported to show how Plaintiff's and the other Class members' money had been spent but which in fact were wildly inaccurate.

227. Defendants also moved funds extensively amongst themselves and to other persons, and created a complex web of corporate entities, in an apparent attempt to hide the proceeds of Plaintiff and the Class members' investments.

228. Because of Defendants' actions, Plaintiff and the members of the Class cannot now determine the location and disposition of their money.

## COUNT XXVI

## CONVERSION
### (Regarding the Senior Defendants, Antonio, Bravata, and Shari Bravata)

229.    Paragraphs 1 through 228 above are realleged and incorporated herein by reference.

230.    These defendants sold investments in BBC Equities to Plaintiff and the other members of the Class, and accepted money from Plaintiff and the other members of the Class for what they claimed were legitimate investments.

231.    Defendants represented to Plaintiff and the other Class members that they would be able to withdraw their money from the purported investment system.

232.    In fact, these defendants took the money that Plaintiff and the other Class members "invested" and appropriated it for their own use.

233.    No Defendant ever indicated to the Plaintiff, class, or any member thereof that the funds "invested" would in fact be taken by these defendants' for their own use and purposes.

234.    These defendants have refused the Plaintiff's and other Class members' requests for the return of their money.

## COUNT XXVII

## CONSPIRACY
### (Regarding all Defendants)

235.    Paragraphs 1 through 234 above are realleged and incorporated herein by reference.

236.    At all relevant times, all Defendants joined in a common effort to commit the tortious conduct and violations of state and federal law alleged in this complaint.

237.    Defendants made their fraudulent misstatements and committed silent fraud as alleged above in part in order to induce Plaintiff and other Class members to invest in BBC Equities.

238    The Defendants planned and together pursued the fraudulent course of conduct.

239.    As a result of the Defendants' conspiracy, Plaintiff and the Class members have suffered considerable financial loss.

## RELIEF REQUESTED

**WHEREFORE, Plaintiffs pray for relief and judgment, as follows:**

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class compensatory damages;

C.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.    Ordering the Accounting Defendants to provide an accounting to Plaintiff and the members of the Class of the use, disposition, and location of the money that they invested with Defendants; and

E.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

/s/ Christopher D. Kaye_____
Mark L. Newman (P51393)
Christopher D. Kaye (P61918)
950 W. University Drive, Suite 300
Rochester, MI  48307
(248) 841-2200
Dated: August 28, 2009                     Attorney for Plaintiff